Ines **TORRES VARGAS,** et al.,
**Plaintiffs, Appellants,**

v.

Dr. Manuel **SANTIAGO CUMMINGS,**
et al., **Defendants, Appellees.**

**No. 97–2389.**

United States Court of Appeals,
First Circuit.

Heard May 5, 1998.

Decided July 10, 1998.

---

Raul S. Mariani Franco, with whom Harry Anduze Montaño was on brief, for appellants.

José Hector Vivas, with whom Rita M. Velez Gonzalez and Vivas & Vivas were on brief, for appellees.

Before SELYA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

Plaintiffs-appellants Ines Torres Vargas, Evelyn Torres Vargas, and Raul Torres Vargas are the adult children of Raul Torres Arroyo. After their father died, they brought suit for medical malpractice against Dr. Manuel Santiago Cummings (Santiago). The district court granted summary judgment for Santiago on the ground that he was an employee of the Commonwealth of Puerto Rico and, as such, was entitled to immunity under Puerto Rico law. The plaintiffs now seek to set aside that decision, claiming that Santiago was an independent contractor (not covered by the immunity provision), or, at least, that discovery should have been allowed before the court ruled. We vacate the summary judgment order.

## I. BACKGROUND

We rehearse the material facts, stating them in the light most favorable to the parties opposing summary judgment, *see Garside v. Osco Drug, Inc.*, 895 F.2d, 46, 48 (1st Cir.1990), and then recount the travel of the case.

## A. *The Facts.*

In 1990, the Puerto Rico Department of Health (the Department) hired Santiago, an anesthesiologist, to render services at Ponce Regional Hospital (the Hospital), a government-owned facility primarily serving indigent patients. The parties' written agreement (the Contract) covered a one-year term commencing on July 1, 1990. It obligated Santiago to work in the Hospital's operating rooms from 7:00 a.m. until 3:00 p.m., Monday through Friday, and to remain "on call" every third weekend. It also required him to complete medical records for assigned patients, submit reports to the Department when requested, and obtain malpractice insurance at his own expense. In return, the Department agreed to pay Santiago a stipend of $10,000 per month, without any withholdings, and also agreed that he could keep any additional fees that he might collect for services rendered to solvent patients (e.g., those who were covered by Medicare or private insurance). The Contract stated explicitly that Santiago would not be entitled to vacation, sick leave, or other fringe benefits.

On February 26, 1991, the Hospital admitted the plaintiffs' decedent, Raul Torres Arroyo (an uninsured person), with complaints of severe throat pain. Dr. Pedro Vendrell, a surgeon, scheduled a laryngoscopy and throat biopsy for the next day. The procedure went badly: Santiago experienced difficulty in intubating Torres Arroyo and a tracheotomy was required. Post-operatively, the tracheotomy tube became dislodged and left the patient without a sufficient airway. As a result, he suffered respiratory arrest, heart failure, and brain damage. Within a week, he died. Torres Arroyo's children blamed a number of care providers, including Santiago, for his demise.

## B. *Travel of the Case.*

After unsuccessfully endeavoring to serve Santiago in the Puerto Rico courts, the plaintiffs voluntarily dismissed all earlier actions against him and brought suit in federal district court. *See* 28 U.S.C. § 1332(a) (1994) (diversity jurisdiction). Santiago answered the federal complaint on September 4, 1996, and two weeks later moved for summary judgment, citing the immunity for government-employed physicians conferred by the Puerto Rico Medico–Hospital Professional Liability Insurance Act (the MHPLIA), P.R. Laws Ann. tit. 26, § 4105 (1997). In their opposition, the plaintiffs countered that the Contract established an independent contractor relationship between Santiago and the Commonwealth, or, alternatively, that his employment status was a question of fact for trial. In addition, they bemoaned the lack of "meaningful discovery," advocated an adjudicative delay, and proclaimed their intention to "supplement the instant request with a [Fed.R.Civ.P.] 56(f) affidavit ... within the next five (5) days." Almost a year elapsed, but the plaintiffs never filed either a Rule 56(f) motion or an affidavit explaining the need for discovery.

On October 15, 1997, the district court granted Santiago's summary judgment motion. This appeal ensued.

## II. DISCUSSION

We begin, and end, with the plaintiffs' primary contention: that, contrary to the lower court's viewpoint, the Contract does not compel the conclusion that the defendant was an employee of the Commonwealth within the meaning of the immunity statute. We divide our analysis into three segments, first describing the MHPLIA, then discussing other legal principles of potential relevance to our inquiry, and finally, addressing the nub of the appellants' asseveration. Because the district court terminated the suit at the summary judgment stage, our review is plenary. *See Garside,* 895 F.2d at 48.

### A. *The MHPLIA.*

The MHPLIA provides:

No health service professional may be included as a defendant in a civil suit for damages due to malpractice caused in the performance of his profession while said health service professional acts in compliance with his/her duties and functions as an employee of the Commonwealth of Puerto Rico, its dependencies, instrumentalities and municipalities.

P.R. Laws Ann. tit. 26, § 4105. The Puerto Rico Supreme Court has construed the MHPLIA as containing three fundamental requirements for immunity:

> (1) [the person who furnishes the service] must be a health care professional; (2) the harm caused by his malpractice must have taken place in the practice of his profession; and, (3) he must have acted in compliance with his duties and functions as an employee of the Commonwealth of Puerto Rico, its agencies, instrumentalities, and municipalities.

*Flores Román v. Ramos González*, 90 J.T.S. 132 (P.R.1990) (official translation, slip op. at 3–4).

The third requirement—that an immunity-seeking health care provider must be an employee of the Commonwealth—often presents the crucial area of inquiry. *See id.* at 5. So it is here: Santiago is a licensed physician and the plaintiffs' complaint alleges that he committed malpractice whilst practicing his profession. Thus, the critical question relates to his employment status.

One seemingly reasonable way of answering this question would be simply to segregate full-time government physicians from part-timers, designating the former "employees" and the later "independent contractors." This solution cannot be countenanced, however, for the MHPLIA has been interpreted authoritatively to protect not only physicians who hold full-time career positions with agencies of the Commonwealth, but also physicians who, though engaged in private practice, function part-time as government employees and who, while acting in that capacity, commit alleged malpractice. *See Lind Rodriguez v. E.L.A.,* 12 P.R. Offic. Trans. 85, 87, 112 P.R. Dec. 67, 68, 1982 WL 210674 (1982).

In search of a principled approach to determining which physicians are entitled to protection under section 4105, we previously parsed Puerto Rico precedents and gleaned the factors to be weighed in determining whether a physician is to be regarded as an independent contractor (and, thus, beyond the prophylaxis afforded by the statute). *See Nieves v. University of Puerto Rico,* 7 F.3d 270 (1st Cir.1993). It was indicative of independent contractor status, we wrote, if the physician

> (1) earned compensation on a per-patient basis, rather than a flat salary;
>
> (2) received no fringe benefits of a type given to the principal's employees (*e.g.,* vacation or sick leave, pension benefits, tax withholding);
>
> (3) personally owned, invested in, or paid for the medical equipment and supplies used to treat patients, or the facilities which formed the situs of that treatment, or personally hired and supervised her own administrative or subsidiary medical personnel;
>
> (4) held and paid for her own medical malpractice insurance policy; or
>
> (5) exercised final judgment as to the appropriate medical treatment to render to patients.

*Id.* at 279. By contrast, it would be indicative of employee status if a health care provider (1) received a flat salary regardless of the number of patients seen or procedures performed, (2) received vacation time, sick leave, and other customary fringe benefits, (3) used only the government's facilities, equipment, supplies, and personnel in rendering services, (4) received protection against malpractice suits at the employer's expense, and (5) enjoyed relatively little autonomy in practice management. *See, e.g., Rivera v. Hospital Universitario,* 762 F.Supp. 15, 17–18 (D.P.R.1991).

Of course, these factors are merely signposts. They are not of equal import: in performing the necessary triage, the principal focus should be on "the level of control contractually reserved to the governmental entity over the physician's provision of patient services." *Nieves,* 7 F.3d at 279. Moreover, no single factor possesses talismanic significance. In the last analysis, a status determination in a particular case inevitably hinges on the totality of the circumstances. *See id.* Therefore, an inquiring court must examine each physician's contract and the surrounding circumstances to determine whether, according to the contract terms and other relevant evidence, the particular physician ranks as an employee of the

government agency or other governmental instrumentality. *See Flores Román,* slip op. at 5–6.

## B. *The Interpretive Framework.*

■ We pause at this juncture to clarify a point of law. The parties in this case agree that the Contract plays a pivotal part in determining the existence *vel non* of section 4105 immunity. They disagree, however, about whether their dispute over its interpretation presents a question of law that may be decided by a court on summary judgment, or, instead, presents a question of fact that precludes the granting of a Rule 56 motion. This disagreement is couched in terms that are reminiscent of a familiar set of legal rules—rules which provide, in general, that a contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of the controverted provision, notwithstanding some ambiguity. *See Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992); *Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD,* 768 F.2d 5, 8 (1st Cir.1985).

The initial step in this pavane—the question of whether a contract is ambiguous—presents a question of law for the judge.[1] *See United States Liab. Ins. Co. v. Selman,* 70 F.3d 684, 687 (1st Cir.1995); *Allen,* 967 F.2d at 698. If the court finds no ambiguity, it should proceed to interpret the contract—and it may do so at the summary judgment stage. *See, e.g., In re Newport Plaza Assocs.,* 985 F.2d 640, 644 (1st Cir.1993); *J.I. Corp. v. Federal Ins. Co.,* 920 F.2d 118, 119 (1st Cir.1990). If, however, the court discerns an ambiguity, the next step—involving an examination of extrinsic evidence—becomes essential.

The taking of this second step does not automatically preclude *brevis* disposition. Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations. *See Allen,* 967 F.2d at 698; *America First*

*Inv. Corp. v. Goland,* 925 F.2d 1518, 1522 (D.C.Cir.1991); *see also Boston Five,* 768 F.2d at 8 (approving summary judgment if "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary"). On the other hand, if "the extrinsic evidence relevant to the interpretation of an ambiguous contractual provision is contested or contradictory, summary judgment will often be inappropriate." *Allen,* 967 F.2d at 698 n. 3.

■ This analytic framework is useful when the parties to a contract are dueling over its meaning and attempt to offer parol evidence to clarify their intent. *See, e.g., id.* at 698–99; *Foster Med. Corp. Employees' Pension Plan v. Healthco, Inc.,* 753 F.2d 194, 198 (1st Cir.1985). Here, however, the framework simply does not fit, for the question is not what any particular provision of the Contract means—indeed, one of the contracting parties (the Department) is not involved in this lawsuit—but, rather, whether the Contract as a whole establishes (or helps to establish) an employer-employee relationship sufficient to confer immunity under section 4105. In such circumstances, the meaning of the contract is for the court. *See, e.g., Williams v. United States,* 50 F.3d 299, 305–07 (4th Cir.1995) (appraising contract between the government and a third party to determine the existence of an employment relationship for purposes of the plaintiff's FTCA suit); *see also Nieves,* 7 F.3d at 279 ("To determine whether a physician claiming section 4105 immunity is an 'independent contractor,' or merely a Commonwealth 'employee,' *the court* must consider the totality of the circumstances, focusing principally on the level of control contractually reserved to the governmental entity over the physician's provision of patient services.") (emphasis supplied). We proceed accordingly.

## C. *The Merits.*

The agreement between Santiago and the Department is entitled "Contract for Individual Professional Services." In addition to its

---

1. Under Puerto Rico law, "ambiguous" means reasonably susceptible to more than one interpretation. *See Borschow Hosp. & Med. Supplies,* *Inc. v. Cesar Castillo Inc.,* 96 F.3d 10, 15–16 (1st Cir.1996); *Travelers Ins. Co. v. Castro,* 341 F.2d 882, 884 (1st Cir.1965).

title, its compensation provisions appear inconsistent with an employer-employee relationship. The relevant portion of the Contract not only entitles Santiago to a stipend from the Department for covering the Hospital's operating rooms, but also enables him to bill solvent patients separately for his professional services and to retain all amounts that he collects from such billings. This stands in stark contrast to the usual employer-employee arrangement, under which the latter receives a straight salary or fixed hourly wage from the former for all services rendered during regular working hours. Even more telling, the Contract stipulates that the Department will make no deductions from the physician's remuneration for taxes, social security, or the like. This circumstance undercuts the defendant's claim that an employer-employee relationship existed. *See Flores Román,* slip op. at 9 (mentioning, with regard to the conclusion that the defendant-physicians were independent contractors, that "income taxes were not withheld from their compensations").

The Contract is equally explicit in denying Santiago the type of incremental benefits that are characteristic of a modern employer-employee relationship. It provides that he "will not be entitled to regular or sick leave, nor to travel expenses, nor will [he] be entitled to fringe benefits." These benefices are staples of conventional employment relationships, and thus, the incidence of such benefits matters in determining whether a health care professional is an employee entitled to immunity under section 4105. *See Flores Román,* slip op. at 6. Conversely, their absence constitutes significant evidence that the contracting parties considered Santiago to be an independent contractor.

The Department's insistence that the defendant furnish his own malpractice insurance also suggests a level of autonomy indicative of independent contractor status. In *Nieves,* where we found the physician-defendants to be employees, we took care to point out that the University of Puerto Rico provided malpractice insurance for them—a fact that "suggested, unless competently rebutted, an employer-employee relationship." 7 F.3d at 280. Here, no countervailing evidence appears in the summary judgment record, and so the Contract's bare insurance mandate tilts toward independent contractor status. *See id.* at 279; *see also Flores Román,* slip op. at 8 (stating, en route to a finding of independent contractor status, that "[s]ince the doctors had absolute control over the type and quality of the treatment provided to their patients," the state agency with which they had contracted required them to provide their own malpractice insurance).

Other provisions of the Contract seem incompatible with the defendant's present assertion that he was a government employee during the relevant time frame. For example, section nine permits the Department to terminate the Contract should Santiago perform negligently or abandon his duties, and, in such event, requires him to "liquidate any work that remains pending at the moment of dissolution without ... any additional payment or compensation." This insistence that the defendant complete his pending work without extra compensation after the contractual relationship ends smacks of an arrangement between principal and agent as opposed to one between employer and employee. Similarly, section eighteen of the Contract states that the defendant's services are "non-delegable." Were Santiago an employee of the Department, this provision would be entirely superfluous. After all, persons who are hired as employees generally do not have unilateral power to delegate their tasks to others. In the same vein, section sixteen stipulates that if the defendant "renders services to the Commonwealth" and is injured, he "may be covered" under the Commonwealth's On-The-Job Accidents Compensation Act. Because employees of the Department are covered automatically under this workers' compensation program, *see* P.R. Laws Ann. tit. 11, § 2 (1997), section sixteen is pleonastic unless the Contract establishes an independent contractor relationship.

To be sure, the Contract is a mixed bag, and some of its features suggest employee status. Santiago apparently used the Hospital's facilities, equipment, staff, and supplies in the performance of his duties. *See Flores Román,* slip op. at 7 (positing that such

usage weighs against independent contractor status). Moreover, the provisions fixing Santiago's duty hours and "on call" schedule are distinctly reminiscent of the type of hegemony that an employer exercises over an employee. So, too, is the Contract's intellectual property provision, section eleven, which provides that any work product resulting from services rendered by Santiago at the Hospital—such as research results—will constitute property of the Department without specific remuneration.

Be that as it may, the Contract is conspicuously silent on the most important factor in the decisional calculus: the amount of independence that the physician retains in dispensing his professional services. *See Nieves*, 7 F.3d at 279. The Contract makes no mention of specific medical functions or duties, other than to state generally that the defendant "commits himself to render anesthesiology services in the [Hospital's] Operating Rooms" and that he "undertakes to perform in accordance with the standards of excellence of the Department of Anesthesiology." Notwithstanding these fragmentary tendrils, the extent to which Santiago is under the Department's control remains very much open to debate.[2]

The lack of competent evidence on this point is especially troubling because of the nature of Santiago's specialty. An anesthesiologist, of necessity, works primarily in operating rooms, and is unlikely to have the same trappings of independence as, say, a primary care physician. Yet, while many anesthesiologists are hospital-based, it does not follow that most anesthesiologists are employed providers as opposed to independent contractors. *See* American Medical Ass'n, *Physician Characteristics and Distribution in the U.S.*, at Table A21 (1997). In such a situation, it seems eminently reasonable to require that an anesthesiologist claiming section 4105 immunity on the ground that he is

a government employee proffer probative evidence of the facts relating to the salient issues of independence and control. And the desirability of such a proffer is heightened where, as may be the case here, the anesthesiologist works less than full time for the government, and, thus, the pivotal inquiry— which must in all events be restricted to his government work—is narrowly focused.

■ We summarize succinctly. On balance, the Contract seems more indicative of an independent contractor than an employee. But the call is not free from doubt, especially since the Puerto Rico Supreme Court interprets section 4105 expansively. *See Vazquez Negron v. E.L.A.*, 13 P.R. Offic. Trans. 192, 196–97, 113 P.R. Dec. 148, 151, 1982 WL 210585 (1982). Bearing in mind that control and the opportunity for the exercise of independent judgment are the key integers in the status equation, *see Nieves*, 7 F.3d at 279, and that the Contract is considerably less than pellucid in this regard, we conclude that the Contract, by itself, does not support the district court's finding that *as a matter of law* the defendant was an employee of the Commonwealth entitled to immunity under section 4105. This conclusion requires us to vacate the judgment below.

Our rationale is straightforward. Section 4105 immunity is an affirmative defense, *see Flores Román*, slip op. at 2, and, accordingly, the defendant bears the burden of establishing its applicability.[3] *See Selman*, 70 F.3d at 691 (noting the "usual rule" that "place[s] the burden of proving affirmative defenses on the party asserting them"). The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive. *See, e.g., Calderone v. United States*, 799 F.2d 254, 258 (6th Cir.1986) (explaining that if a summary judgment movant has the burden of proof, "his showing must

---

2. The Contract does require that the defendant report to the Department (when asked to do so) "about the service that [he] commits [him]self to perform and about the duties that [he] undertakes to comply with." Still, this provision cuts both ways; it may very well suggest that Santiago sets his own work responsibilities within the prescribed temporal schedule.

3. In *Nieves*, we assumed this allocation of the burden of proof, but found a waiver. 7 F.3d at 279 n. 16. Here, unlike in *Nieves*, it is clear that the defendant has not fulfilled his initial obligation to proffer evidence sufficient to establish employee status, and waiver is not legitimately in issue.

be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (citation and emphasis omitted); *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986) ("[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor.") (emphasis in original). Measured by this yardstick, the defendant's proffered evidence—the Contract—falls short.

Where, as here, an employment agreement, in itself, does not provide sufficiently strong proof of a defendant's employment status to warrant summary judgment, other evidence sometimes may cure the defect. To this end, Santiago posits that he must be deemed an employee of the Commonwealth even if the Contract, read as a whole, fails to carry the day "because he was complying with the year of public service . . . in order to comply with the requisites to obtain [a] license to practice medicine in Puerto Rico." Appellee's Brief at 3. This argument is unconvincing. The Contract says nothing about the public service requirement, and the documentation that the defendant submitted to the district court on this point—two affidavits signed months prior to the execution of the Contract—are far from self-elucidating. Without better evidence, the existing record does not establish either that Santiago toiled at the Hospital, under contract, for a probationary public service year (during which he treated Torres Arroyo) or that the conditions attached to such service rendered him an employee for purposes of section 4105.

We need go no further. A trial court may grant summary judgment only if the record defoliates all genuine issues of material fact. *See* Fed.R.Civ.P. 56(c). Here, the assembled facts, taken in the light most flattering to the plaintiffs' theory of the case, simply do not dictate a conclusion that the defendant functioned as an employee of the Department during the period in question. Consequent-

ly, we vacate the order granting summary judgment and remand the matter.[4] The employment status issue requires further development.

*Vacated and remanded. Costs to appellants.*

---

4. We do not pass upon the appellants' "denied discovery" claim. On remand, discovery presumably will be available to both sides under a scheduling order. *See* Fed.R.Civ.P. 16(b)(3); D.P.R. Loc. R. 314.2.