# United States Court of Appeals
## For the First Circuit

No. 22-9001

IN RE: MARY E. BUSCONE, d/b/a FroYo To Go,

Debtor,

ANN TRACY BOTELHO,

Appellee,

v.

MARY E. BUSCONE,

Appellant.

APPEAL FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Gelpí, Lynch, and Thompson,
<u>Circuit Judges</u>.

<u>David G. Baker</u>, for appellant.

<u>Thomas C. LaPorte</u>, with whom <u>LaPorte Law Group, PLLC</u> was on brief, for appellee.

February 22, 2023

**THOMPSON**, <u>Circuit Judge</u>.    A tale as old as commerce: Two friends, next door neighbors in fact, enter, and exit, business together, leaving behind unmet expectations and financial acrimony.    Sprinkle in a default judgment or two, alongside a tortured discovery dispute, and we reach today's appeal.    At issue is an adversary proceeding[1] brought by Appellee Ann Tracy Botelho ("Ann") against Mary E. Buscone ("Mary") during Mary's bankruptcy proceedings.[2]    Ann sought a determination by the bankruptcy court that her claim against Mary was excepted from Mary's discharge because it was procured by fraud; the litigation ultimately resulted in a default judgment for Ann excepting her claim of $91,673.45 from Mary's discharge.

For the reasons we get into below, we affirm the bankruptcy court's rulings.    We begin by describing the chronology of events leading to this appeal, as well as its broader context within bankruptcy law, before analyzing the merits of Mary's claims now before us.    Throughout, we are mindful of the Bankruptcy Appellate Panel's ("BAP") opinion, which largely affirmed the bankruptcy court's holdings when it considered this appeal in the

---

[1] "[A]n adversary proceeding is a subsidiary lawsuit within the larger framework of a bankruptcy case." <u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, 872 F.3d 57, 63 (1st Cir. 2017) (quoting <u>Kowal</u> v. <u>Malkemus</u> (<u>In re Thompson</u>), 965 F.2d 1136, 1140 (1st Cir. 1992)); <u>see also</u> Fed. R. Bankr. P. 7001.

[2] Given the similarities between both parties' last names, we refer to them by first name to avoid confusion.    We mean no disrespect in doing so.

first instance.[3]  See Botelho v. Buscone (In re Buscone), 634 B.R.
152 (B.A.P. 1st Cir. 2021).

## I.  Background

### A.  The Underlying Dispute

In 2012, neighbors Mary and Ann decided to open a frozen
yogurt shop together.  Unfortunately, the business ceased
operations in 2014, and Ann filed for bankruptcy later that year.[4]
Of import to this case, Ann listed no claims against Mary on her
bankruptcy schedules.  Ann received a Chapter 7 discharge soon
after, which liquidated the assets included in her schedules, other
than those deemed exempt, to a trustee to be distributed to
creditors.[5]

The years passed without note, until Ann sued Mary in
state court in 2018.[6]  For reasons unknown, Mary failed to respond

---

[3]  While we appreciate the BAP's detailed and rigorous
analysis, "we accord no particular deference to determinations
made by the [panel] but, rather, focus exclusively on the
bankruptcy court's determinations."  In re Cancel, 7 F.4th 23, 28
(1st Cir. 2021) (citation omitted).

[4] Our apologies for the legalese we will inevitably deploy as
we attempt to describe these bankruptcy proceedings.  Given the
somewhat unique premises and purposes of bankruptcy law, as well
as the specialized terminology it relies on, we provide a primer
in the next section for clarity.

[5] The trustee found that there was no property available for
distribution from the estate over and above what was exempted by
law, and, accordingly, discharged the pending claims against her
without payment.

[6] According to her verified complaint filed with the Middlesex
Superior Court, Ann brought claims of breach of contract, breach
of fiduciary duties, unjust enrichment, breach of implied covenant
of good faith and fair dealing, and fraud against Mary.

- 3 -

to the suit, resulting in a default judgment of $91,673.45 for Ann.[7] In order to execute the judgment, the state court attached a lien for that amount plus interest to Mary's home. Soon thereafter, Mary commenced her own Chapter 7 case in which she listed in her schedules Ann's claim against her in the default judgment amount. While Mary pursued her bankruptcy, Ann initiated an adversary proceeding seeking a determination that her claim against Mary was non-dischargeable for the purposes of Mary's bankruptcy. Ann filed her complaint under 11 U.S.C. § 523(a)(2)(A) -- which states that a bankruptcy discharge "does not discharge an individual debtor from any debt . . . for money, property, [or] services . . . to the extent obtained by—false pretenses, a false representation, or actual fraud" -- and § 523(a)(4), which states that a discharge does not include debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"

Ann alleged that her claim represented damages accrued as a result of Mary's false and fraudulent representations in the course of their business dealings. Specifically, Ann claimed that she had contributed $31,000 from her savings to pay for startup

---

[7] The record does not include the state court's default judgment, but the state court docket indicates that this amount was awarded. See United States v. Mercado, 412 F.3d 243, 247 (1st Cir. 2005) (holding that the court may take judicial notice of state court records); see also Stevenson v. TND Homes I, LP (In re Stevenson), 583 B.R. 573, 575 n.3 (B.A.P. 1st Cir. 2018) (taking judicial notice of a relevant state court docket).

costs for the yogurt shop and had loaned the partnership she and Mary had created another $95,000 to cover outstanding business obligations. She further alleged that she had withdrawn the rest of her savings to defray these obligations and that Mary, rather than repaying her as agreed, had used partnership funds to pay for Mary's daughter's tuition. This debt procured through fraud, she contended, was not appropriate for discharge.

## B.  Mary's Motion for Summary Judgment

Per Mary's thinking, there was a wrinkle in Ann's plan to foreclose discharge of Mary's debt -- judicial estoppel. Ann's failure to list her claim against Mary in her 2014 bankruptcy schedules, the reasoning went, barred her from now bringing a non-dischargeability claim against Mary concerning the debt. In a motion to dismiss raising this theory in the form of an affirmative defense, Mary argued as much. Ann countered Mary's motion by contending that her failure to disclose Mary's debt had been made "inadvertently and through mistake, as well as a lack of understanding as to what [the relevant bankruptcy schedule] called for." Ultimately, after converting the motion to dismiss to one for summary judgment, the bankruptcy court denied Mary's motion for reasons we'll detail shortly.[8]

---

[8] Over Ann's objections, the bankruptcy court removed the lien in the course of granting Mary's discharge -- a removal contingent upon the resolution of any pending adversary claims. And indeed, Ann's complaint was outstanding.

## C.  The Discovery Dispute

What followed next was a prolonged discovery dispute, eventually resulting in yet another default judgment against Mary -- this time as a sanction for her failure to comply with the court's discovery orders.  Given the alleged discovery issues raised here on appeal, we necessarily detail what transpired.  The discovery troubles seem to have begun in earnest when a deposition of Mary was suspended when she was a no-show.  Things went downhill from there; discovery spats culminated in Ann reporting to the court that Mary had failed to respond to multiple interrogatories and requests for production of documents.  Given these failures, the court authorized Ann to file additional discovery motions, and she did.

Frustrated by Mary's persistent discovery breaches, Ann filed her first motion to compel.  Through it, she sought a reimbursement of attorneys' fees, along with other sanctions, for Mary's and her attorney's (David Baker's)[9] failure to comply with their discovery obligations.

Following a telephonic hearing, the bankruptcy court granted the motion and entered an order directing Mary to "serve a written response that fully complies with [Rule] 34 . . . to

---

[9] From here, Baker becomes a main character in this story due to his central role in the discovery controversy at the heart of this case.  Thus, we identify him by name throughout our retelling of the events that follow.

[Ann's] request for production of documents #10-14 and to produce any and all documents responsive to such requests" within seven days.[10] Further, because Mary had failed to timely respond to Ann's legitimate discovery requests even after the motion was filed, the court, as a sanction, deemed any objections to the requests waived. Finding that Mary's failure to respond was not substantially justified, and that Ann had attempted in good faith to resolve the discovery dispute without court involvement, the court granted Ann's request for fees incurred because of the violations. The court called for Baker, whom it found responsible for many of the discovery transgressions, to pay stenographer and attorneys' fees for the deposition that Mary had missed.

The order's issuance prompted Mary to urge the court to reconsider,[11] but the court declined Mary's invitation to re-litigate the sanction order. From there the underlying neglect continued as Mary, even after getting hit with discovery sanctions,

---

[10] Ann had requested copies of Mary's tax documents, loan applications, resumes or curricula vitae, and documents related to efforts to collect payment for her tax or creditor obligations, as well as a signed authorization to obtain Mary's credit report.

[11] In its order, the court had also sought a response from Mary on the reasonableness of the $13,500 in fees Ann had requested for having to pursue her sanction motions. While Mary primarily responded by challenging the discovery order in its entirety, she did suggest a lower award. Specifically, she argued that a fee award would be unjust -- claiming, contrary to the court's findings, that Ann had not made any good faith attempts to resolve the matter without court action and that Mary's failure to comply with discovery amounted to excusable neglect.

still failed to serve the requested responses within the time frame set by the order.

What followed was a second motion to compel which sought additional sanctions.[12]  Notably heightening the stakes, Ann, in addition to requesting reimbursement for the additional attorneys' fees she had incurred, asked for the entry of a default judgment in her favor due to the "flippant, but willful" conduct of Mary and/or Baker.  Then, after a contentious hearing on Ann's motion[13] which included an acrimonious exchange between the court and Baker,[14] the court found that Baker had failed to comply with the discovery obligations mandated in its first order.  A few weeks later, the court issued an order finding that default judgment in

---

[12]  In it, Ann lamented that she had yet to receive any responses to her remaining discovery requests and had received multiple non-responsive and inappropriate answers to her second set of interrogatories.

[13]  There, Ann argued that Mary had failed to comply with the court's prior order.  Ann's representative argued that certain responses "violated the spirit of [the] order" -- such as one where Mary noted that she did not "feel" that the requested documents "appl[ied] in this matter," despite the court's ruling that Mary had waived objections to the discovery requests.  Ann's attorney further argued that some responses were "evasive" and "sarcastic" -- such as Mary's response to a supplemental interrogatory where she simply stated "I have no idea what you're talking about."  Most importantly, Ann's counsel pointed out that Baker had still failed to produce the documents ordered by the court.

[14]  At one point, the court directly confronted Baker, asking: "[W]hy shouldn't I enter a default judgment against your client . . . under Rule 37 for a failure to abide by clear orders of the Court?"  What followed was a long back and forth in which Baker repeatedly insisted he had complied.  After some prying by the court, and obfuscation by Baker, he ultimately conceded that he had failed to serve a response compliant with the order.

Ann's favor was warranted. In its ruling, the court recognized the seriousness and infrequency of imposing a sanction as harsh as entry of default judgment but reasoned that doing so here was appropriate given Mary's complete flaunting of the court's discovery orders, along with the fact that lesser sanctions had already failed to motivate compliance. As for prejudice to Ann, the court stated: "Plaintiff cannot be expected to prosecute a case in which she has the burden of proof where the Defendant and her counsel have failed to respond to discovery for many months and then obfuscated the issues when called upon to answer for this avoidance." That same day, the court issued an order granting the default judgment and excepting Mary's debt to Ann -- amounting to $91,673.45 (plus interest and costs) -- from Mary's discharge.[15]

### D.  Mary's Motion to Reconsider

Undeterred, Mary filed a motion asking the bankruptcy court to reconsider. She urged the court to rescind its orders granting Ann's second motion to compel and to reassess and grant her motion for summary judgment.

---

[15] In granting Ann's second motion to compel, the bankruptcy court also quantified the attorneys' fees awarded in its first order and granted additional fees for expenses incurred afterwards. The court found that Baker was responsible for Mary's discovery failures that gave rise to both motions and ordered him to pay Ann's attorneys' fees totaling $9,163.60 for work done towards them.

It did not. Rather in a curt order, the court, taking issue with Mary's motion in both style and substance, again sided with Ann and adopted her argument that the sanctions, including the default judgment, were quite fitting in light of Mary's failure to comply with what the court "very clearly, on the record, ordered." In its ruling, the court noted, critically, that Mary hadn't even bothered to cite to the relevant Bankruptcy Rules in making her request, nor had she asserted grounds sufficient to warrant reconsideration. In the court's view and as the rules demand, Mary had failed to establish any "newly discovered evidence or a manifest error of fact or law." In re Wedgestone Fin., 142 B.R. 7, 8 (Bankr. D. Mass. 1992). Finally, the court rejected Mary's newly raised argument challenging the court's quantification of Mary's debt to Ann, which listed an amount that had not been raised in the litigation but had been sua sponte determined by the court in its order entering the default judgment. Responding to her jurisdictional and substantive challenges to the amount listed in the order, the court, citing Chen v. Huang (In re Huang), 509 B.R. 742 (Bankr. D. Mass. 2014), maintained that it had the jurisdiction to so act and added that "[i]n any event, the amount listed in the [d]efault judgement . . . is [also] the amount listed in [Mary's] Schedule E/F as undisputed."

Unsuccessful before the bankruptcy court, Mary turned to the BAP for relief. But we need not detail its findings here --

- 10 -

it is enough to say, as we previewed earlier, that the BAP largely affirmed the bankruptcy court's rulings.  See In re Buscone, 634 B.R. at 158.  And here we are.  Before us, Mary now challenges: (1) the bankruptcy court's denial of her motion for summary judgment; (2) the default judgment entered against her as a discovery sanction (framing her argument as a three-pronged attack challenging the sanction itself, the bankruptcy court's jurisdiction to list a specific monetary amount alongside it, and the manner in which the court arrived at the amount that it did); and (3) the court's denial of her motion to reconsider.  We take each in turn, pointing out the appropriate standards of review along the way.  But before we plunge into the summary judgment dispute, we provide a legal primer touching upon bankruptcy principles, and their interplay with judicial estoppel, so that the gentle reader will better understand our reasoning.

## II.  Analysis

### A.  The Legal Context

#### 1.  Chapter 7 Bankruptcy

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"  Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367 (2007) (quoting Grogan v. Garner, 498 U.S. 279, 286-87 (1991)).  One mechanism for doing so is Chapter 7 bankruptcy, which permits "an insolvent individual to discharge certain unpaid debts toward that end" by authorizing

- 11 -

"a discharge of prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors." Id.

In other words, "[w]hen a debtor files for bankruptcy, [her] interests in property are either compiled into the bankruptcy 'estate' from which (to the extent the estate can afford) [her] creditors will be paid, or those interests are exempted from the estate for the debtor to keep." Rockwell v. Hull (In re Rockwell), 968 F.3d 12, 17 (1st Cir. 2020); see also 11 U.S.C. § 541. "When the estate is created, a combination of federal and state law determines which of the debtor's assets are exempted (and will remain safe from creditor collection) and which belong to the estate (and will be lost to the debtor)." In re Rockwell, 968 F.3d at 17-18; see also 11 U.S.C. § 522(b).

In order to determine the size and scope of the estate, as well as how it will be distributed to creditors, a bankruptcy court relies on an individual's bankruptcy "schedules." When filing for bankruptcy, debtors are obligated to fully disclose the extent of their assets and debts, including their contingent claims against others and those held against them, in such schedules. "The successful functioning of the bankruptcy code hinges both upon the bankrupt's veracity and [her] willingness to make a full disclosure." Marrama v. Citizens Bank of Mass. (In re Marrama), 430 F.3d 474, 482 (1st Cir. 2005) (quoting Boroff v. Tully (In re

- 12 -

Tully), 818 F.2d 106, 110 (1st Cir. 1987)), aff'd, 549 U.S. 365 (cleaned up). Accordingly, "[t]he bankruptcy court is entitled to demand utmost good faith and honesty from debtors in the preparation of their schedules and statements of affairs." Id.

## 2. Judicial Estoppel in Bankruptcy

As raised here, countless courts have confronted the question of how best to deal with cases where the debtor has failed to make the full requisite disclosure in her initial bankruptcy petition. One adverse repercussion has been, in many instances, to bar the debtor from subsequently making claims that conflict with her prior disclosures. This bar is known as judicial estoppel -- a doctrine which courts rely upon "to prevent a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." Rockwood v. SKF USA Inc., 687 F.3d 1, 11 (1st Cir. 2012) (quotations omitted).

Courts have developed and applied the doctrine of judicial estoppel for one paramount purpose: "'to protect the integrity of the judicial process,' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (first quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982); then quoting United States v. McCaskey, 9 F.3d 368, 378 (5th Cir. 1993)). In pursuit of this principle, the

- 13 -

Supreme Court has stressed that the doctrine is equitable, and "invoked by a court at its discretion." Id. at 750 (quoting Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)). Accordingly, our judicial superiors have cautioned that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," id. (quoting Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir. 1982)), and have therefore declined to "establish inflexible prerequisites or an exhaustive formula for determining the applicability of [the doctrine]." Id. at 751; see also Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) (noting that "[t]he contours of [judicial estoppel] are hazy, and there is no mechanical test for determining its applicability"). Still, the Court has asserted two baseline factors which, when met, afford a court the discretion to estop a party from asserting a legal position. "First, a party's . . . position must be clearly inconsistent with their earlier position," and second, they must have "succeeded in persuading a court to accept [their] earlier position." New Hampshire, 532 U.S. at 750.

However, a court's judicial estoppel inquiry does not end there; as the high Court has stressed, "[a]dditional considerations may inform the doctrine's application in specific factual contexts." Id. at 751. For example, the Court highlighted

- 14 -

that "[a] third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Id.; see also Alt. Sys. Concepts, 374 F.3d at 33 (noting that "courts frequently consider a third factor:  absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage?").  After weighing the relevant factors, a court may exercise its discretion and apply judicial estoppel should it believe that "a litigant is playing fast and loose with the courts" or that "intentional self-contradiction is being used as a means of obtaining unfair advantage."  Patriot Cinemas, Inc. v. Gen. Cinemas Corp., 834 F.2d 208, 212 (1st Cir. 1987) (cleaned up).

In the bankruptcy context, this has often meant that a debtor, "having obtained judicial relief on the representation that no claims existed, can not now resurrect them and obtain relief on the opposite basis."  Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc., 989 F.2d 570, 571 (1st Cir. 1993). In other words, an individual who has received a discharge based on schedules that failed to list an asset, such as a claim they had for credit from another, may not go ahead and pursue the claim in a subsequent proceeding.  We have previously acknowledged that, in its worst form, attempting to do so amounts to a strategy of "palpable fraud" on the court:  "[c]onceal your claims; get rid of

- 15 -

your creditors on the cheap, and start over with a bundle of rights." Id.

This appeal raises the distinct problem of whether a court is bound to reason so, and apply judicial estoppel at summary judgment, regardless of the factual circumstances at issue and in the face of allegations that a prior omission was inadvertent and may be remedied. Under the law of some of our sister circuits, this question implicates a reasonably common "exception" to judicial estoppel, under which "parties who fail to identify a legal claim in bankruptcy schedules may escape the application of judicial estoppel if they can show that they 'either lacked knowledge of the undisclosed claims or had no motive for their concealment.'" Guay v. Burack, 677 F.3d 10, 20 (1st Cir. 2012) (citing Fifth, Sixth, Tenth, and Eleventh Circuit cases that have adopted this exception) (cleaned up).

Courts range in how they've applied this and other defenses to judicial estoppel;[16] for our part, in Guay, we pointed

_____

[16] Courts have grafted a range of intentionality requirements, and inadvertence defenses, to their judicial estoppel jurisprudence when considering whether or not the doctrine should bar a debtor's subsequent inconsistent claims. See, e.g., Slater v. U.S. Steel Corp., 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc) (requiring the debtor to have "intended to make a mockery of the judicial system"); White v. Wyndham Vacation Ownership, Inc., 617 F.3d 472, 476 (6th Cir. 2010) (requiring the debtor to have acted in bad faith); Zinkand v. Brown, 478 F.3d 634, 638 (4th Cir. 2007) (holding that "[w]ithout bad faith, there can be no judicial estoppel").

out that "[w]e have never recognized such an exception and have noted that deliberate dishonesty is not a prerequisite to application of judicial estoppel." Id. at 20 n.7. Here, Mary asks us to confront the exception head on, and nip it in the First Circuit's bud once and for all. However, once again the appropriate vehicle for resolving the question evades us, as this

---

Within this group, some courts have taken an objective approach to assessing a debtor's intentions underlying their prior omission of a claim. Examples include considering an omission inadvertent only if the debtor neither knew about the claim nor had motive to conceal it, or attaching a presumption of bad faith if the debtor had such knowledge or motive. See, e.g., Eastman v. Union Pac. R.R., 493 F.3d 1151, 1157 (10th Cir. 2007); Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 321 (3d Cir. 2003); In re Coastal Plains, Inc., 179 F.3d 197, 210 (5th Cir. 1999). Other courts have taken a subjective approach, calling for the estoppel analysis to consider the circumstances of the omission and any explanations provided by the debtor. See, e.g., Martineau v. Wier, 934 F.3d 385, 393 (4th Cir. 2019); Slater, 871 F.3d at 1180.

As some courts in the latter group have pointed out, the ability to escape estoppel under the objective approach may be illusory, as a debtor generally has motive to conceal a claim from their schedules in order to shield it from creditors. See Ah Quin v. Cnty. of Kauai Dep't of Transp., 733 F.3d 267, 271 (9th Cir. 2013) (noting that the common "interpretation of 'inadvertence' is narrow in part because the motive to conceal claims from the bankruptcy court is, as several courts have explained, nearly always present").

We note that in this circuit, our precedent has occasionally invoked the language of "intentional self-contradiction" when describing instances where judicial estoppel should apply. See, e.g., Patriot Cinemas, 834 F.2d at 212 ("Judicial estoppel should be employed when . . . 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" (quoting Scarano v. Central R.R. of N.J., 203 F.2d 513 (3d Cir. 1953)). However, our case law has yet to examine what, if anything, might distinguish such self-contradiction from an unintentional mistake, and we decline to do so today.

case terminated before the bankruptcy court had the opportunity to fully litigate the applicability of judicial estoppel in the first instance and the question of whether an equitable exception should be recognized and applied. Therefore, we once again leave the question for another day, and based upon the particular facts of this case, we instead hold only that the bankruptcy court did not abuse its discretion in denying Mary's summary judgment motion. That is so because Mary failed to meet her burden of convincing the bankruptcy court that the undisputed facts here mandated application of judicial estoppel, and on appeal fails to demonstrate how the court's denial constituted an abuse of discretion. Our reasoning follows.

## B. Mary's Motion for Summary Judgment

De novo review guides our analysis and we reverse only if we find that there was no genuine dispute of material fact and Mary was entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 762-63 (1st Cir. 1994) ("In bankruptcy, summary judgment is governed in the first instance by Bankruptcy Rule 7056," which "incorporates into bankruptcy practice the standards of Rule 56 . . . ."). Within this analysis, however, we afford deference to the bankruptcy court's underlying determinations regarding judicial estoppel. Rockwood, 687 F.3d at 10. As we have noted, "[e]videntiary rulings have the potential to shape and winnow the

- 18 -

scope of the summary judgment inquiry, and a trial court should have as much leeway in dealing with those matters at the summary judgment stage as at trial." Alt. Sys. Concepts, 374 F.3d at 31–32. Because "judicial estoppel fits neatly into this taxonomy," id., "[w]e apply the deferential abuse of discretion standard to judicial estoppel rulings" even within our de novo review of the court's summary judgment decision, Rockwood, 687 F.3d at 10. Such deference to the trial court is central to judicial estoppel review; "abuse of discretion is a flexible standard, and the amorphous nature of judicial estoppel places a high premium on such flexibility." Alt. Sys. Concepts, 374 F.3d at 31 (cleaned up). Therefore, "we will not lightly substitute our judgment for that of the [trial] court, and will reverse only if we are left with a definite and firm conviction that the court below committed a clear error of judgment." Guay, 677 F.3d at 16 (cleaned up).

### 1. Denial of Judicial Estoppel

We start with Mary's primary focus on appeal, the court's estoppel ruling, because it gave way to the rest of the litigation now before us. That is, had the bankruptcy court been in legal agreement with Mary at the summary judgment stage, the discovery dispute, the default judgment, and the exclusion of Ann's claim from Mary's discharge would never have arisen. We begin by highlighting the events preceding the summary judgment ruling, which created, in the eyes of the bankruptcy court, a material

- 19 -

factual dispute. Responding to Mary's request for dismissal on the basis of judicial estoppel, Ann submitted an affidavit that called into question whether the doctrine should apply, by stating that her prior omission was inadvertent. She stated she had no idea that her claim -- according to her, a loan regularly being repaid by Mary at the time -- should have been listed in her schedules. In her affidavit she further outlined her intention to reopen and correct her 2014 Chapter 7 bankruptcy proceedings (which she did by adding a contingent claim against Mary).[17] Having accepted the affidavit and converted Mary's initial motion to dismiss into one for summary judgment, the court authorized Mary to submit any additional material she deemed pertinent to her motion.[18] Mary responded with legal arguments and a primary contention that Ann's affidavit was "implausible . . . since her attorney was a well known and highly competent attorney, who is now a chapter 7 panel trustee."

---

[17] The record indicates that in re-processing her bankruptcy petition Ann requested the appointment of a trustee, who reported that he would not pursue the claim.

[18] On appeal, Mary urges us to consider an affidavit from Anne White, who served as Ann's bankruptcy counsel in 2014, as evidence of the implausibility of Ann's affidavit. However, this affidavit was submitted at a later stage, in support of Mary's motion to reconsider. We need not opine on the evidentiary value of this submission, as it was not before the court when it made the summary judgment ruling.

The court did not agree with Mary's assessment of the record as then extant, and here we think it best to quote its own words more fully:

> [T]he motion being based on an affirmative defense; the party bearing the burden of proof as to the defense having submitted no evidence; the Court being bound for purposes of summary judgment to view the evidence in the light most favorable to the non-moving party, which in this instance would require the Court to assume that the omission in question was unknowing and not intended to deceive and the standard for judicial estoppel being less than wholly settled and, in any event, involving considerable judicial discretion; the Motion . . . is hereby denied.

In making this ruling, it is clear to us that the bankruptcy court was reserving final resolution of the estoppel issue for trial -- on the record before it, the court deemed summary judgment inappropriate pending further factual development that might factor into the judicial estoppel calculus.[19]

---

[19] On appeal, Mary continues to challenge the plausibility of Ann's affidavit. However, we see no error in the court assuming the veracity of Ann's representations for the purpose of summary judgment. Summary judgment leaves "no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)." Fed. Refin. Co. v. Klock, 352 F.3d 16, 30 (1st Cir. 2003) (quoting Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). Rather, the court "must accept the facts most favorable to the nonmoving party . . . and draw all reasonable inferences to that party's behoof." Id. While courts "need not, however, give credence to mere allegations, or draw inferences where they are implausible or not supported by specific facts," Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991) (cleaned up), we do not view the court as having done so here.

In support of her challenge to the bankruptcy court's decision, Mary urges that our judicial estoppel case law has been consistent as well as pellucid -- claiming that our general rule requires estoppel of a claim inconsistent with a previously accepted bankruptcy schedule. See Guay, 677 F.3d at 17 ("[A] failure to identify a claim as an asset in a bankruptcy proceeding is a prior inconsistent position that may serve as the basis for application of judicial estoppel, barring the debtor from pursuing the claim in a later proceeding."). Therefore, she argues that judicial estoppel should have applied here due to Ann's prior inconsistent statement and success in relying on that statement in her previous bankruptcy proceedings. She further leans on Payless, and quotes the case in order to speculate that Ann unacceptably "'played fast and loose with the facts'; concealed her claim against [Mary] by not disclosing it; got rid of [Mary] as a creditor via the discharge; then started over with a 'bundle of rights[.]'" Yet Mary misrepresents the totality of our case law and Supreme Court precedent on this issue: It is not as rigid as she would have us hold.

We reiterate that, according to the Supreme Court, there are no "inflexible prerequisites or . . . exhaustive formula[s] for determining the applicability of judicial estoppel." New Hampshire, 532 U.S. at 751; see also Brooks v. Beatty, No. 93-1891, 1994 WL 224160, at *2 (1st Cir. May 27, 1994) ("Judicial

estoppel is an equitable device which does not lend itself to reflexive application."). Our case law on judicial estoppel has emphasized that, while it is "widely agreed that, at a minimum, two conditions must be satisfied before judicial estoppel can attach[,]" "[e]ach case tends to turn on its own facts." Alt. Sys. Concepts, 374 F.3d at 33. This language echoes the Supreme Court's cautionary note that, in addition to these requirements, "[a]dditional considerations may inform the doctrine's application in specific factual contexts." New Hampshire, 532 U.S. at 751 (emphasis added). As we read it, the Court acknowledged the fact-intensive nature of the inquiry when it explicitly suggested a third consideration[20] for courts ruling on whether to apply judicial estoppel -- prompting them to ask, even if the requirements were met, "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. This comports with the purpose of the doctrine -- not to impose a reflexive bar to certain claims, but rather to safeguard the integrity of the courts by estopping litigants believed to be "playing fast and loose with the courts," and using "intentional

_____

[20] As noted earlier and worth stressing again, while the Supreme Court discussed a third consideration, it expressly declined to establish "an exhaustive formula for determining the applicability of judicial estoppel." New Hampshire, 532 U.S. at 751.

self-contradiction . . . as a means of obtaining unfair advantage." Patriot Cinemas, 834 F.2d at 212.

In light of the doctrine's construction, we observe no abuse of discretion in the court's decision to deny Mary's request for judicial estoppel at summary judgment.  We need not adopt any doctrinal exception to reason so; like the Supreme Court, we simply "do not question that it may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.'"  New Hampshire, 532 U.S. at 753 (quoting John S. Clark Co. v. Faggert & Frieden, P.C., 65 F.3d 26, 29 (4th Cir. 1995)).  Essentially, what the case before us underscores is the reality that factual circumstances drive the estoppel analysis, and that declining to apply judicial estoppel might be reasonable in those instances where further factual development will better inform the ultimate decision, and where it is not immediately clear that estoppel would advance the doctrine's primary purpose of safeguarding the integrity of the courts.[21]

---

[21] We are also in agreement with the bankruptcy court's view of the procedural posture of this case.  As the bankruptcy court observed, judicial estoppel is an affirmative defense that Mary had the burden of proving.  See U.S. Liab. Ins. Co. v. Selman, 70 F.3d 684, 691 (1st Cir. 1995) ("[T]he usual rule, honored by . . . most jurisdictions, is to place the burden of proving affirmative defenses on the party asserting them."); Fed. R. Civ. P. 8(c)(1) (listing estoppel as an affirmative defense); Fed. R. Bankr. P. 7008 (applying Federal Rule of Civil Procedure 8 to adversary proceedings in bankruptcy).  We see no abuse of discretion in the bankruptcy court's conclusion that Mary failed to meet that burden.

This decision seems reasonable in light of the limited evidence before the bankruptcy court. Although Mary demonstrated the minimum requirements for judicial estoppel -- pointing to Ann's successful reliance on a prior inconsistent position -- her filings did little to demonstrate how, as a matter of law, the circumstances favored the court exercising its discretion to apply the doctrine to Ann's claims.

In so holding, we do not write on a blank slate. Our reasoning parallels that deployed in Brooks v. Beatty, 1994 WL 224160, a comparable bankruptcy case involving judicial estoppel. There we concluded that

> [a]n examination of the evidence adduced on summary judgment below indicates that [the defendant] established a genuine issue of material fact concerning her bona fides in failing to schedule . . . an asset in her chapter 7 case . . . . [B]ecause the issue arose on summary judgment we must credit the . . . affidavit as a plausible basis for . . . a possible defense against a finding of bad faith. The conflicting evidentiary signals simply illustrate that the judicial estoppel issue was inappropriate for summary disposition under Rule 56.[22]

---

In response to Ann's affidavit claiming inadvertence, Mary argued that the explanation was implausible and, in any event, irrelevant. Regarding implausibility, the court did not agree and pointed to the dearth of evidence presented by Mary refuting Ann's claim. Regarding the relevance of Ann's affidavit, the court reserved that question for further factual development at trial.

[22] We pause to clarify that at no point in Brooks did the court adopt an "exception" to judicial estoppel or hold that an ultimate showing of inadvertence would allow the debtor to escape judicial estoppel. Instead, like the bankruptcy court here, the appellate panel determined that the factual dispute at issue made

Id. at *3 (emphasis omitted).  Like in Brooks, here we affirm that the bankruptcy court was not required to resolve the estoppel issue -- which, as the bankruptcy court put it, "involv[es] considerable judicial discretion" -- at summary judgment on the facts that were presented below.

But not so fast, says Mary.  On appeal, she points to two cases she says support her claim of error, Payless and Guay.  Yet in pointing to these cases, she does little to grapple with why the debtor's actions (as found by the court) in both cases favored the application of judicial estoppel, and whether the same could be said here.  As Ann counters, in both cases this court named and took offense with specific aspects of the debtor's conduct that supported the legal conclusion that they were playing "fast and loose with the courts."  In Payless, the court argued that "[e]ven a cursory examination of the claims shows that [the creditors] should have figured in [the bankruptcy] proceedings,

the judicial estoppel question inappropriate for resolution on summary judgment.  Like what happened here, the Brooks court "permit[ted] [the debtor] to reopen her chapter 7 proceeding and amend her schedule of assets to include the [omitted] action, permit[ting] the bankruptcy court to afford notice thereof to [a chapter 7 trustee] . . . to sell or abandon the [previously omitted] action or to intervene in the pending district court action."  1994 WL 224160, at *3.  The Brooks court held that, should the debtor ultimately proceed with her previously omitted claim, "the district court should resolve the judicial estoppel issue on the merits following an evidentiary hearing."  Id.  As we describe, the default judgment awarded to Ann terminated the litigation before the merits of Mary's judicial estoppel claim could be reached.

and that [the debtor] could not have thought otherwise." 989 F.2d at 571. Further, the Payless court took issue with the "brazenness of [the debtor's] ambivalence[,]" as "illustrated by [the debtor's] . . . assertion that the statute of limitations [governing the previously omitted claims] had not run because it had been tolled by the pendency of [the bankruptcy proceedings]." Id. And even the Payless court's holding was limited to "the facts [t]here present," thus clearly recognizing the need for a full and fact-sensitive digest. Id. at 572. Similarly, in Guay the court, when it "turn[ed] to the equities," homed in on multiple facts evidencing deceit by noting that: "in addition to neglect of their general duty to disclose newly acquired assets, the [debtors] twice represented to the bankruptcy court that no such assets existed"; their discharge "occurred months after the [debtors] became aware of their claims and the obligation to amend the schedules had arisen"; and "[the debtor's] repeated denial of the existence of the claims t[ook] on added significance." 677 F.3d at 18, 20 (emphasis omitted).

These observations both underscore the fact intensive nature of the estoppel inquiry and distinguish the cases from Mary's appeal today. In contrast to the litigants in Guay and Payless, Mary, who had the burden of proof on her summary judgment motion, presented no comparable evidence showing that Ann engaged in intentional conduct that posed a threat to "the integrity of

- 27 -

the courts by . . . manipulating the machinery of the judicial system," or that she was "playing fast and loose with the courts."[23] Id. at 16 (quoting Alt. Sys. Concepts, 374 F.3d at 33). Nor was there indication that Ann stood to gain an "unfair advantage."[24] Given these deficiencies, we cannot hold that the court was obligated to apply the discretionary doctrine at summary judgment.

_____

[23] We acknowledge Mary's argument that certain facts within Ann's complaint support Mary's conclusion that Ann knew she had a claim in 2014 -- namely, that Mary had agreed to (and apparently had made) some payments to Ann around the time she was filing for bankruptcy. We will not displace the bankruptcy court's judgment that these facts did not sufficiently make Mary's case that estoppel need apply. We contrast Mary's speculation with other forms of evidence that might have helped the court in its ultimate factual determination -- such as the transcript from the "341 meeting" of creditors, during which Ann would have been examined under oath by the trustee about her actual or contingent claims. 11 U.S.C. § 341(d).

[24] In her brief, Ann argues that her willingness to reopen and correct her 2014 petition means "judicial integrity was not undermined." We pause to flag that our case law strongly cautions that reopening will not necessarily be viewed as a favorable factor. "[A]llowing . . . a debtor to 'back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them. This so-called remedy would only diminish the necessary incentive' for the debtor 'to provide the bankruptcy court with a truthful disclosure of his assets.'" Guay, 677 F.3d at 21 (quoting Moses v. Howard Univ. Hosp., 606 F.3d 789, 800 (D.C. Cir. 2010)). But see Martineau, 934 F.3d at 395-96 ("[W]e 'see no good reason why, when determining whether a debtor intended to manipulate the judicial system, a district court should not consider' a bankruptcy court's decision 'to allow the debtor to amend his disclosures or reopen his bankruptcy case' without imposing any sanction." (quoting Slater, 871 F.3d at 1187)). Because Ann's reopening of her bankruptcy case does not figure into our analysis of Mary's appeal, we give no more consideration to it.

See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive."). Or put differently, on this summary judgment record we do not fault the court for not determining that Ann's conduct was "an unacceptable abuse of judicial proceedings." Guay, 677 F.3d at 20 n.8; Payless, 989 F.2d at 571.[25]

We end with an important coda before departing appellate issue number one. In affirming the bankruptcy court's ruling today, it is not our intention to undermine the fundamental bankruptcy tenet that "[a] bankruptcy court is entitled to demand utmost good faith and honesty from debtors in the preparation of their schedules and statements of affairs." In re Marrama, 430 F.3d at 482. We also reiterate our precedential caution that "a party is not automatically excused from judicial estoppel if the earlier statement was made in good faith." Thore v. Howe, 466 F.3d 173, 184 n.5 (1st Cir. 2006) (emphasis added). Rather, what we express here is our unwillingness to hold, on these facts, that

---

[25] We also note that it does not seem Ann was unfairly advantaged by the court's deferred resolution of the factual dispute until trial. Rather, the real fix Mary finds herself in -- to wit, her inability to discharge Ann's debt -- is due to the problems stemming from what happened after the court entered its interlocutory order. Because of her self-inflicted wounds, the case terminated in default judgment before the court had the opportunity to definitively resolve the estoppel controversy.

the bankruptcy court lacked the discretion to deny summary judgment when it concluded that the issue of judicial estoppel's application needed to be more thoroughly litigated at trial.

We soldier on.

### C.  Ann's Default Judgment Award

After losing at summary judgment, next came Mary's and Baker's chain of discovery violations, which ultimately led to Ann's second motion to compel and resultant default judgment award. Mary timely appealed the orders, attacking them on three fronts, and we now consider the merits of her arguments.

### 1.  Default Judgment as a Discovery Sanction

Mary raises several challenges to the court's imposition of discovery sanctions, which we review for abuse of discretion even when they concern a sanction as severe as entry of default judgment. United States v. Klimavicius, 847 F.2d 28, 32 (1st Cir. 1988).  In describing her litigation conduct, Mary argues that she "did the best she could to comply with discovery requests" even though they were, in her view, "abusive."[26]  Challenging the default

---

[26] She also attempts to challenge the attorneys' fees ordered by the court to be paid by Baker due to his discovery abuses.  The BAP held that Baker had failed to bring the appeal properly in his name, and that Mary lacked standing to challenge the sanctions ordered against Baker.  In re Buscone, 634 B.R. at 166.  The BAP further noted that Mary's briefing failed to address the propriety of the sanctions anyway.  Id. at 166-67.

Mary's appellate brief to this court takes issue with this characterization but still fails to present any arguments that

judgment, she claims that the bankruptcy court made no "principled analysis" of the motion to compel requesting the sanction, nor of the principles underlying default judgment as a discovery sanction.[27]  Ann counters these claims, arguing that Mary's multiple discovery violations appropriately led to the default. We note that, under our abuse of discretion standard, "[t]he choice of sanction lies in the purview of the district court." AngioDynamics, Inc. v. Biolitec AG, 780 F.3d 429, 435 (1st Cir. 2015).  "As we have observed in the past, 'this standard of review

address the fees or provide us with any insight into why she believes the court erred in awarding them.  In this absence, we bypass the standing question in order to affirm the bankruptcy court on the grounds that we observe no abuse of discretion here. See First State Ins. Co. v. Nat'l Cas. Co., 781 F.3d 7, 10 n.2 (1st Cir. 2015) (noting that "[w]e may continue to bypass thorny jurisdictional issues and resolve cases on the merits where, as here, those jurisdictional issues implicate only statutory or prudential considerations"); Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006) (noting that "[t]he determination of who may maintain an otherwise cognizable claim turns on a question of prudential standing, not one of Article III standing"); see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 n.3 (2014) (declining to decide whether limitations on third-party standing are constitutional or prudential).

[27] Mary also argues that the default judgment was "especially an abuse of discretion since it is indisputable that [Ann's] cause of action was barred by the statute of limitations."  However, she does not identify any statute of limitations related to Ann's bankruptcy cause of action.  We observe that, according to her motion to reconsider, Mary believes Ann's claims were barred by the statute of limitations for actions alleging a breach of fiduciary duties.  However, Ann's breach claim was litigated in state court, and Mary should have raised her challenges to it there.  Because it is irrelevant to the bankruptcy litigation, which solely concerned the dischargeability of Mary's debt to Ann, the bankruptcy court committed no error in failing to address it.

is not appellant-friendly -- and a disgruntled litigant bears a heavy burden in attempting to show that an abuse occurred.'" Id. (quoting Tower Ventures, Inc. v. City of Westfield, 296 F.3d 43, 46 (1st Cir. 2002)).

In reviewing the default judgment sanction, we consider the totality of circumstances surrounding its imposition. Hooper-Haas v. Ziegler Holdings, LLC, 690 F.3d 34, 38 (1st Cir. 2012). To aid in our analysis, we look to a non-exhaustive list of factors, including: "the severity of the violation, the legitimacy of the party's excuse, repetition of violations, deliberateness [or not] of the misconduct, mitigating excuses, prejudice to the other side and to the operations of the court, and the adequacy of lesser sanctions." Robson v. Hallenbeck, 81 F.3d 1, 2 (1st Cir. 1996). We also consider "whether the [bankruptcy] court gave the offending party notice of the possibility of sanctions and the opportunity to explain its misconduct." AngioDynamics, 780 F.3d at 435.

Unfortunately for Mary, these factors cut strongly in favor of affirming the bankruptcy court's default judgment. Throughout the discovery litigation, Mary and Baker's discovery violations increased in severity. What began as a missed deposition quickly snowballed into a pattern of discovery abuses -- including multiple failures to produce or respond to discovery requests, arguably sarcastic and evasive responses to

interrogatories, and an overall unwillingness to appropriately engage with opposing counsel and follow the rules of discovery. Most concerningly, these violations continued even after the bankruptcy court had ordered Mary's attorney to comply with certain requests and had already imposed the lesser sanction of fees for earlier abuses. See Tower Ventures, 296 F.3d at 46 (noting that "disobedience of court orders, in and of itself, constitutes extreme misconduct" worthy of severe sanction).

During the second motion to compel hearing, and in his filings, appearances, and correspondences prior to it, Baker, as the bankruptcy court rationally concluded, failed to provide any legitimate, let alone mitigating, excuses for his discovery violations. At most, he referenced his confusion about the numbering of Ann's requests, which he had apparently failed to secure clarity on before the hearing. Further flouting the first order's ruling that Baker had waived any objections to the discovery requests, his attempts at explanation mostly amounted to expressing disagreement with the requests, which he described in his objection to the second motion as "grossly disproportionate and irrelevant." His attempts to argue similarly on appeal remain unpersuasive; these self-serving characterizations do not mitigate his discovery violations and are certainly not acceptable reasons for failing to comply with a court order.

Baker was clearly on notice about the severity of his misconduct and the possibility of receiving a default judgment sanction prior to, and unquestionably during, the second motion to compel hearing. Notice began with the bankruptcy court's scheduling and pre-trial order, which stated that failure to strictly comply with discovery orders and deadlines "may result in the automatic entry of a dismissal or a default, or sanctions, as the circumstances warrant in accordance with Fed. R. Civ. P. 16 and 37." As the order cited, Federal Rule of Civil Procedure 37(b)(2)(A)(vi) empowers courts to sanction a noncompliant party by entering a default judgment against them. See also Fed. R. Bankr. P. 7037 (applying Federal Rule of Civil Procedure 37 to adversary proceedings); Hooper-Haas, 690 F.3d at 37 ("A court faced with a disobedient litigant has wide latitude to choose from among an armamentarium of available sanctions. The entry of a default is one of these sanctions." (citation omitted)).

Notice continued with the court's order granting Ann's first motion to compel, which found that Mary had committed discovery abuses warranting the sanction of attorneys' fees to be paid to Ann. After failing to comply with the first order, Ann's second motion to compel put Mary and Baker on crystal clear notice by expressly requesting that the court enter default judgment against Mary due to Baker's conduct throughout discovery.

This reached an apex during the hearing, when the bankruptcy court asked Baker point blank why it should not enter default judgment against his client under Rule 37, for failure to abide by clear orders of the court. Baker provided no meaningful response -- instead, he insisted he had complied until he was ultimately pushed to admit otherwise. While Baker denied that he was intentionally obfuscating, either way he failed to provide any legitimate reasons for his noncompliance.

Contrary to Mary's claims otherwise, what followed was a thoughtfully reasoned analysis by the bankruptcy court. The court acknowledged the severity of the default judgment sanction, noting that it was "highly reluctant" to "enter such a serious sanction" and had "rarely, if ever[,] done so." However, after considering the legal and factual factors highlighted above, the court found that default judgment was "fully warranted" in light of the totality of the circumstances -- including Ann's clear notice that she was seeking default judgment and Baker's failure to argue for the adequacy of lesser sanctions. The court deemed lesser sanctions inadequate anyway, given Mary's and Baker's failure to provide any creditable argument for not complying with the court's first order, repeated failures to respond to discovery requests, attempts to obfuscate issues before the court, and continued noncompliance despite the fact that the court had already

imposed the lesser sanction of shifting fees to them for their discovery violations.

"We have said before, and today reaffirm, that a party who flouts a court order does so at its own peril." Hooper-Haas, 690 F.3d at 37. "Although entry of default judgment is a drastic sanction, it nonetheless provides a useful remedy where . . . a litigant is confronted by an obstructionist adversary." Angiodynamics, 780 F.3d at 436 (cleaned up). We see no abuse of discretion in the bankruptcy court concluding so here, and thus affirm the court's grant of default judgment against Mary.

## 2. The Bankruptcy Court's Jurisdiction to Quantify its Judgment

Mary next challenges the amount listed in the bankruptcy court judgment, charging that the court exceeded its jurisdiction when it deemed $91,673.45 -- representing Mary's debt to Ann -- non-dischargeable in Mary's bankruptcy. We review this question, and the bankruptcy court's conclusion that it had jurisdiction, de novo. Samaan v. St. Joseph Hosp., 670 F.3d 21, 27 (1st Cir. 2012); see also United States v. Santiago-Colón, 917 F.3d 43, 49 (1st Cir. 2019) ("Jurisdiction is a question of law subject to de novo review." (quoting United States v. W.R. Grace, 526 F.3d 499, 55 (9th Cir. 2008))).

We observe at the outset, as Mary does not dispute, that the bankruptcy court had jurisdiction to determine the dischargeability of her debt to Ann. This jurisdiction is

- 36 -

conferred under 28 U.S.C. § 157(b)(1), which authorizes bankruptcy courts to "hear and determine . . . all core proceedings . . . and . . . enter appropriate orders and judgments." Among the core proceedings within a bankruptcy court's purview are "determinations as to the dischargeability of particular debts." Id. § 157(b)(2)(I). In granting a default judgment to Ann and in declaring her debt non-dischargeable, the court clearly acted in exercise of its core authority. While Mary has no jurisdictional quibble with those decisions, she insists "the court exceeded its jurisdiction in determining the amount of [her] debt." According to her, the court did not have the jurisdiction to list this amount, which had not been raised by either party throughout the litigation. However, she does not meaningfully explain why she believes this was a jurisdictional overstep, or why we should arrive at the same conclusion.

Instead, she hangs her hat overwhelmingly on Cambio v. Mattera (In re Cambio), a case where this circuit's BAP held that "the bankruptcy court did not have jurisdiction to enter a money judgment on the nondischargeable debt under the circumstances of this case." 353 B.R. 30, 34-35 (B.A.P. 1st Cir. 2004). However, she also appropriately acknowledges bankruptcy cases within this circuit that have arrived at the opposite conclusion, such as Boudreau v. United States (In re Boudreau), where the BAP reasoned that "the determination of the amount of any nondischargeable debt

- 37 -

(as well as the extent of the debtor's liability on that debt) [is] an essential element of the matter to be determined by, and within the jurisdiction of, the bankruptcy court."  622 BR 817, 826 (B.A.P. 1st Cir. 2020) (quoting In re Huang, 509 B.R. at 754). Mary provides us with no jurisdictional framework for why she believes (in her words) In re Cambio's analysis is right and In re Boudreau is wrong.[28] [29]

---

[28] In our efforts to piece together her primary argument, we take it to be that In re Boudreau "is wrong because in a no-asset chapter 7 case where there will be no distribution to creditors, determination of the amount of the debt is a noncore, state-law matter that could only be determined on consent of the parties, or possibly by making a report and recommendations to the district court."  This claim, which she grounds on Stern v. Marshall, 564 U.S. 462 (2011), and Wellness International Network, Ltd. v. Sharif, 575 U.S. 665 (2015), lacks legal foundation.  In Stern, the Supreme Court concluded that bankruptcy courts lack "the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  564 U.S. at 503.  In Sharif, the Court clarified that such "Stern claims" may still be litigated in bankruptcy court on consent of the parties.  Sharif, 575 U.S. at 669.  These holdings do not speak to the bankruptcy proceedings here; as we describe more fully below, Ann's state law claims were resolved in state court, and she secured final judgment on them there.

While Mary also suggests that the In re Boudreau panel erred by failing to cite to In re Cambio, a precedential opinion, we need not probe this claim any further because it does nothing to advance her argument that the bankruptcy court lacked jurisdiction here.

[29] In light of the absence of meaningful engagement, we decline to wade into the broader jurisdictional divide among courts reflected by the diverging approaches adopted by our BAP in In re Cambio and In re Boudreau on the question of whether bankruptcy courts have jurisdiction to enter money judgments on non-dischargeable debts.  We note that, generally, courts have favored In re Boudreau's expansive jurisdictional approach and concluded

- 38 -

Nonetheless, she does cite to a case, In re Huang, 509 B.R. 742, that nimbly discusses and makes effort to reconcile the seeming In re Cambio/In re Boudreau divergence and which we find helpful for informing and simplifying our analysis here. There, the bankruptcy court contemplated the scope of its jurisdiction to issue money judgments in non-dischargeability proceedings. Within its analysis, the court acknowledged the noteworthy ambiguity surrounding the term "money judgment," pointing out that "it has become obvious that the term . . . means different things to different parties and different courts." Id. at 749. The court, while holding that bankruptcy courts lacked the jurisdiction to issue "money judgments" enforceable by execution, concluded that it had the jurisdiction to "determine the amount of a debt and the debtor's liability in connection with a dischargeability proceeding." Id. at 749-50. We find this distinction instructive

that bankruptcy courts have the power to enter such money judgments. See In re Boudreau, 622 B.R. at 824-27 (applying the expansive jurisdictional approach); see also In re Cambio, 353 B.R. at 32 ("Indeed, every circuit to address the issue has held that there is federal bankruptcy jurisdiction to liquidate and enter a judgment on a nondischargeable debt." (collecting circuit court cases)). However, some courts have opted for In re Cambio's limited approach -- concluding that, at least in certain cases, an entry of money judgment is outside of the scope of a bankruptcy court's jurisdiction. See In re Cambio, 353 B.R. at 33-35 (applying the limited approach and collecting cases holding similarly). As we describe below, our holding today simply affirms the authority of the bankruptcy court here to have issued the judgment as we understand it.

and are confident the bankruptcy court had it in mind when it entered the default judgment as it did.

The bankruptcy order stated, in relevant part: "The court hereby orders, adjudges, and declares that the judgment debt of the defendant and debtor, [Mary], to the plaintiff, [Ann], in the principal amount of $91,673.45, plus all interest and costs due thereunder, is excepted from discharge." Unlike a judgment for execution, the order here is best understood to be a simple recognition and acceptance of the state court's judgment which established, for non-dischargeability purposes, the amount of the debt (at least as it stood on the day the judgment was entered). Or put differently, the order judicially noticed a state court judgment. In fact, the court's later order denying Mary's motion to reconsider strengthens this interpretation, as there the bankruptcy court cited In re Huang, which declared the bankruptcy court's jurisdiction to enter a non-executable non-dischargeable figure, to support its "view that it may determine the amount of a claim in a nondischargeability action." Narrowly viewed as such,[30] we cannot conclude that the bankruptcy court's judgment exceeded its jurisdiction.

---

[30] Other than maintaining that (without explaining why) In re Cambio's analysis is right, Mary presents no arguments in support of her belief that the bankruptcy court's judgment was a jurisdictional overstep. Her cursory citations do not get her far; as we reiterate, In re Cambio held that "the bankruptcy court

### 3. The Amount Quantified

With that clarified, we next consider Mary's substantive challenge to the judgment amount, where she charges that even if the court had the requisite jurisdiction, it erred in arriving at the figure it did. Likening the court's actions to a due process violation, she states that she did not receive sufficient notice and opportunity to be heard prior to the court's determination that her debt to Mary equaled $91,673.45. Recall, at the second motion to compel proceeding, that the bankruptcy court, in essence, took the default judgment matter under advisement and it was only later on that the court filed orders granting the motion and quantifying the amount excepted from discharge. In Mary's view, the court should have conducted an evidentiary hearing to solicit recommendations from the parties, rather than sua sponte relying on her bankruptcy schedules to make the determination.

---

did not have jurisdiction to enter a money judgment on the nondischargeable debt under the circumstances of this case[.]" In re Cambio, 353 B.R. at 34-35 (emphasis added). Because she does not examine In re Cambio's analysis, nor contemplate how the circumstances of that case mirror the circumstances here, we need not either. We also acknowledge the In re Huang court's belief that its holding necessarily conflicts with In re Cambio, by inferring that the "money judgments" prohibited by In re Cambio include amount determinations like those endorsed in In re Huang. In re Huang, 509 B.R. at 752-55. Because Mary acknowledges this disagreement but does not weigh in on its substance, we merely note that we do not necessarily read the two cases to be in conflict and leave our substantive analysis of the two for another day.

We believe Mary's reconsideration motion preserved her challenge to the court's monetization ruling; therefore, we review this question for abuse of discretion. AngioDynamics, 780 F.3d at 436; see also HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc., 847 F.2d 908, 919 (1st Cir. 1988) ("We review a determination that a hearing was not compulsory under Rule 55(b) only for abuse of discretion."). Here, we see none.

Federal Rule of Civil Procedure 55(b)(2) provides that a court "may conduct hearings . . . when, to enter or effectuate judgment, it needs to" conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. See also Fed. R. Bankr. P. 7055 (applying Federal Rule of Civil Procedure 55 to adversary proceedings). Litigants are not entitled to such hearings; "[i]t is settled that, if arriving at the judgment amount involves nothing more than arithmetic—the making of computations which may be figured from the record—a default judgment can be entered without a hearing of any kind." HMG Prop. Invs., 847 F.2d at 919. Mary has not made it clear why a hearing was needed in this case, nor does she explain how one would have altered the bankruptcy court's calculation.

On appeal, Mary presents two arguments. First, she attempts to distinguish her scheduling from one of a debt -- citing 11 U.S.C. § 101 in order to demonstrate that "[t]he term 'debt'

means liability on a claim," whereas "[t]he term 'claim' means -- right to payment, whether or not such right is . . . disputed." 11 U.S.C. §§ 101(5)(a), 101(12). This is a distinction without a difference here. As we mentioned, Ann has a final judgment against Mary in state court which, according to the state court docket, Mary has never attempted to vacate.

As for Mary's second argument, where she cautions against relying on the state court judgment because "it is a default judgment, and Massachusetts ordinarily does not accord collateral estoppel liability status to default judgments," we find it a non-starter. In support of this proposition, she cites to Smith Barney, Inc. v. Strangie (In re Strangie), 192 F.3d 192 (1st Cir. 1999). However, this misrepresents the reasoning in In re Strangie, where the court took issue with providing preclusive effect to a prior judgment because it was not final. Id. at 194. Here, to repeat, Ann's state court judgment against Mary is final. Moreover, her argument also misrepresents the proceedings below. Contrary to Ann's assertions, the bankruptcy court did not apply collateral estoppel.[31] Rather, once Ann's dischargeability claim

---

[31] Collateral estoppel "precludes relitigation of issues in prior actions between the parties or those in privity with those parties, provided the issues were actually litigated in the first action, and determined by a 'final judgment on the merits.'" In re Stanley-Snow, 405 B.R. 11, 18 (B.A.P. 1st Cir. 2009).
While "[i]t is within a court's discretion to apply collateral estoppel to a default judgment," Mary is correct that in

was "litigated" -- admittedly, through yet another default judgment -- the bankruptcy court included in its judgment the amount Mary listed in her schedules which reflected the damages awarded to Ann by the state court.[32] [33]   Therefore, we hold that the bankruptcy court did not abuse its discretion in declining to provide an evidentiary hearing, and we affirm its determination excepting Ann's $91,673.45 claim against Mary from discharge.

We briefly note, however, that this amount may no longer reflect the debt owed to Ann.  By Ann's admission, Mary has made some payments toward the debt, and as the bankruptcy court suggested by holding the "interest and costs due thereunder" non-dischargeable, state law provides for interest to accrue post-judgment.  See Mass. Gen. Laws ch. 231, §§ 6B, 6C, 6H (establishing annual interest rates for damages awarded by Massachusetts state

---

Massachusetts "default judgments are generally not given collateral estoppel effect on an issue in a subsequent action because the issues have not been actually litigated." Id. at 19. However, as we describe, we do not observe the bankruptcy court to have applied the doctrine here, as Mary was not estopped from litigating Ann's federal claims.

[32] Regardless of whether Mary chose to characterize Ann's demand as a claim or a debt, the judgment is the judgment.

[33] Given this conclusion, we need not discuss Mary's argument that "the evidentiary value of schedules in this context is de minimus." See Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 505 n.13 (B.A.P. 1st Cir. 2009) ("Generally, a bankruptcy court may properly consider a debtor's petition, schedules and statement of affairs as evidentiary admissions made by the debtor.  Therefore, a debtor's schedules may be admissible as nonhearsay evidence to establish the validity and ownership of a claim against a debtor when the debtor is the party objecting to the claim." (citation omitted)).

courts).  Because the Commonwealth court is best suited to make a precise calculation as to what is owed and how the state judgment can be executed, we leave it to the parties to sort out the contours of the debt in state court.

### D.  Mary's Motion to Reconsider

We now review Mary's last challenge wherein she claims the bankruptcy court erred in denying her request for relief from its prior orders.  In doing so, we defer to the bankruptcy court as we review its denial of Mary's motion to reconsider; denials are reviewed for "manifest abuse of discretion" due to the significant discretion granted to trial courts when deciding reconsideration motions.  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 55 (1st Cir. 2008).

To begin, we consider Mary's motion -- filed fourteen days after the bankruptcy court granted Ann's second motion to compel -- to be brought under Federal Rule of Bankruptcy Procedure 9023.[34]  See Fed. R. Bankr. P. 9023 (setting a fourteen-day deadline

---

[34] The bankruptcy court took issue with Mary's failure to cite Federal Rules of Bankruptcy Procedure 9023 or 9024 within the motion.  We appreciate the lack of clarity in the filing -- even Mary's brief before us imprecisely claims that the motion was captioned in "obvious reference" to Bankruptcy Rule 9024.  However, given the timing of the motion and the relief requested, we consider it under Rule 9023.

for filing a motion to alter or amend a judgment and making Federal Rule of Civil Procedure 59 largely applicable to such motions).[35]

Relief under a motion for reconsideration is granted sparingly. Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014); see also Ramirez Rosado v. Banco Popular de P.R. (In re Ramirez Rosado), 561 B.R. 598, 607 (1st Cir. B.A.P. 2017). Such motions are "generally denied because of the narrow purpose for which they are intended." In re Ramirez Rosado, 561 B.R. at 608. They are "not the venue to undo procedural snafus or permit a party to advance arguments it should have developed prior to judgment, nor [are they] a mechanism to regurgitate old arguments previously considered and rejected." Biltcliffe, 772 F.3d at 930 (cleaned up). Rather, relief is granted "only when the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations." Id.

We discern no manifest abuse of discretion by the bankruptcy court, given that Mary's original motion, and arguments on appeal, primarily regurgitate arguments previously rejected by the court. Her brief makes little mention of how precisely the

---

[35] Perplexingly, Mary primarily argues that the court should have considered her motion for reconsideration under the motion to dismiss standard. See Ashcroft v. Iqbal, 556 US 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."). This is incorrect. The bankruptcy court applied the correct standard -- Mary's motion was not a complaint and should not have been reviewed as one.

court erred in denying her motion to reconsider. Instead, it is littered with objections to the legitimacy of the court-ordered discovery items and attempts at defending her and Baker's actions throughout the discovery litigation. Any meritorious arguments in this vein either had been considered, or should have been raised, far earlier on in the discovery dispute, and neither a motion for reconsideration, nor an appeal from its denial, are appropriate vehicles for attempting to relitigate them.

Accordingly, we affirm the court's order denying Mary's motion for reconsideration.

### III.  Conclusion

For the reasons outlined above, we affirm the bankruptcy court's orders denying Mary's motion for summary judgment, granting Ann's second motion to compel, and denying Mary's motion for reconsideration. Accordingly, costs are awarded to Ann. See Fed. R. App. P. 39.